**I. L. PARKS, Plaintiff-Appellant,**

v.

**MIDLAND FORD TRACTOR COMPANY, a corporation, Defendant-Respondent.**

**No. 32606.**

St. Louis Court of Appeals.

Missouri.

May 16, 1967.

**24**

J. Andy Zenge, Jr., Dennis W. Smith, Canton, C. Kenneth Thies, Clayton, for appellant.

Shepley, Kroeger, Fisse & Shepley, George S. Hecker, St. Louis, for respondent.

TOWNSEND, Commissioner.

Action for breach of an alleged oral contractual promise to pay a certain employment "bonus" for the calendar year 1963. A nine-man (and lady) verdict for defendant was returned. After a motion for a new trial was overruled appeal was taken to this Court.

After a brief term of employment in another capacity plaintiff and defendant's president, Mr. Woods, entered into an oral agreement in June 1961 for plaintiff

to act as general sales manager of defendant. In this capacity plaintiff operated for the balance of the year 1961 and received the same salary as before plus transportation and all expenses when away from home. Shortly after the beginning of the year 1962 plaintiff was importuned by defendant's president to take upon himself the position of general manager of the company; plaintiff accepted. The crux of the present controversy is found in the agreement reached at this time. The agreement was entirely oral; the conversation occurred in the president's office with no other person present. Plaintiff testified that under the agreement reached at that time plaintiff was to be paid, in addition to a stated salary, a certain bonus if gross sales exceeded a named amount *plus* another conditional bonus, graduated upward from $10,000, if the net profits of the company before taxes equalled or exceeded $200,000. Defendant's president categorically denied that there was any agreement for the payment of the latter bonus; the other principal terms as above stated were not contradicted.

Around the first of the year 1963 the president informed plaintiff that his salary for the year would be increased to a stated amount; plaintiff testified that the president told him that the new salary arrangement "would not in any way affect my bonuses." Plaintiff does not recall whether the president elaborated on what bonuses were referred to. On January 18, 1963, the president wrote a letter to plaintiff, advising him of the salary increase and stating: "You have again been elected a Vice President of Midland Ford Tractor Company and the writer is again appointing you as General Manager. * * * Your incentive sales compensation will continue in 1963." Plaintiff's employment with the defendant was terminated in November 1963 owing to differences of opinion about policy and instructions. Plaintiff admits that he received full payment of the bonus based on gross sales of 1962 and of 1963. In January 1964 he received from defendant a check for $396.25 which was designated in the accompanying memorandum as "Discretionary Bonus" of $500, reduced by the amount of the usual withholding taxes.

Thus, the position of the plaintiff is that his contract as general manager called for the payment of a bonus based on profits in 1962 and that the arrangement for that type of bonus continued for the year 1963. Plaintiff makes no claim for a profit bonus for the year 1962, because, he asserts, he was paid the profit bonus of $10,000 for that year; he would thereby show that the defendant recognized the alleged profit bonus term of the contract.

In support of the latter contention plaintiff showed that on November 30, 1962, he was paid $10,000[1]; the memorandum acompanying the check did not indicate the basis upon which this payment was made. Plaintiff testified that the check was handed to him by the defendant's president in plaintiff's office; he recalled only that the president commented that "it was a job well done" and that he thanked the president. Defendant emphasizes that on November 30, 1962, the corporation's net profits for the year 1962 could not then have been ascertained. As to the $10,000 payment, defendant's president testified on direct examination:

"Q. Would you describe to the jury the occasion on which you gave this to him?

A. We gave bonuses to all employees before Christmas each year if we had profits, and Mr. Parks was given a bonus the same day the other employees of the company were."

The court directed the jury to disregard further answers of the president relating to the manner in which the amount of the payment was arrived at. There was evidence from one side tending to show that

---

1. Minus federal and state withholding taxes.

there were net profits of $200,000 for the year, and from the other side tending to show that there were not net profits of as much as $200,000 for the year, all depending upon the analysis of the corporation's balance sheet and its income tax return for 1962.

■ Appellant's first point is that the verdict was against the overwhelming weight of the evidence. That point must be rejected. "The jury, in the first instance, is the sole judge of the credibility of the witnesses and of the weight and value of their evidence, and may believe or disbelieve the testimony of any one or all the witnesses, though such evidence be uncontradicted and unimpeached." Cluck v. Abe, 328 Mo. 81, 40 S.W.2d 558, 559. And see J. D. Streett & Co. v. Bone, Mo., 334 S.W.2d 5, 9. Consequently the plaintiff's assertion of this point in the motion for new trial preserved nothing for review. True enough, "the trial court in the exercise of its sound judicial discretion may set that verdict aside as against the weight of the evidence. * * * However, in the exercise of that discretion it may determine not to set the verdict aside." J. D. Streett & Co. v. Bone, supra. Here the trial court overruled plaintiff's motion for a new trial. "There is, perhaps, no more firmly established doctrine than that on appeal from a judgment rendered on a verdict of a jury, an appellate court is not authorized to weigh the evidence. * * * Whether a jury's verdict is against the weight of the evidence is a question for the trial court alone." Wilcox v. Coons, 362 Mo. 381, 241 S.W.2d 907, 917. The point is not properly before us.

In support of its denial that defendant agreed to pay plaintiff the $10,000 bonus in question defendant introduced evidence upon two principal points, 1. that no agreement to pay such a bonus was ever made by the president and 2. that defendant's president had no authority to enter into any such arrangement on behalf of defendant. Plaintiff alleges error in the admission into evidence of the defendant's Articles of Incorporation and its By-laws and the Statutes of Minnesota, state of defendant's incorporation, all relating to the authority of corporate officers.[2]

■ The power of a corporate officer, like that of any other agent, to bind his corporation in contract rests either upon his actual authority or upon his apparent authority. His actual authority derives, on the one hand, from statute or from the articles and by-laws of the corporation or on the other hand from his exercise of functions on behalf of the corporation, long tacitly acquiesced in by those in legal control of the corporation, the directors. See Washington Sav. Bank v. Butchers' and Drovers' Bank, 107 Mo. 133, 17 S.W. 644; Fair Mercantile Co. v. Union-May-Stern Co., 359 Mo. 385, 221 S.W.2d 751 (the latter case may also be an illustration of apparent authority although reliance by a third party upon an appearance of things does not clearly appear). In contrast, apparent authority is brought into existence by the principal's creation of an appearance of affairs which would cause a reasonable person to believe that the officer had actual authority to do a particular act, upon which appearance a third person relies.

■ Plaintiff pleaded that defendant, "by and through its officers, agents and representatives, entered into an oral contract" for plaintiff's employment, under

2. The relevant portion of the Minnesota statute provides: "All officers shall, respectively, have such authority and perform such duties in the management of the business of the corporation as may be prescribed in the by-laws, or, in the absence of controlling provisions in the by-laws, as may be determined by the board of directors." The by-laws recite that "the president shall be chief executive officer. * * * He shall have general charge; supervision and control of the business and affairs of the corporation, subject, however, to the control of the board of directors." The articles simply show that the defendant was incorporated under the Minnesota statute.

which "plaintiff would be paid a bonus of $10,000 for each year" etc. The answer denied this allegation insofar as the promise to pay the $10,000 bonus is asserted. In this state of the pleadings it was the right of the defendant to show that the president had no actual authority to make a corporate contractual promise to pay a $10,000 bonus based upon profits. To that end it introduced the evidence about which complaint is now made. Such evidence cannot be regarded as irrelevant, as plaintiff contends. In like manner it was the right of the plaintiff to introduce pertinent evidence to show either the president's actual authority or his apparent authority to act in the questioned respect; plaintiff introduced no evidence as to actual authority. Nor was apparent authority proved; plaintiff contented himself with assuming the president's authority because he thought the president was "king bee". In any event plaintiff rested under the burden of showing that the defendant corporation entered into a contract with the bonus term alleged and that in turn rested upon the authority of the president to act for the corporation in that respect.

Defendant placed in evidence a resolution of its Board of Directors, adopted February 26, 1962, resolving that plaintiff "be employed as General Manager" and stating the amount of his base salary. The resolution also provided for the bonus based on gross sales, but made no mention of any other kind of bonus. Prior to the date of this resolution there had been conferences and correspondence among and between Woods, director Hill (apparently representing the controlling interest in defendant) and company's counsel regarding the engagement of a new general manager owing to Woods' impending assumption of the presidency of a California-based corporation (Woods had been designated not only as president but also as general manager of the defendant). The company's counsel was also Assistant Secretary of defendant, kept all minutes and became its trustee in dissolution. Woods discussed with counsel the terms of the agreement to be entered into with plaintiff; these terms included a bonus based on gross sales and no other type of bonus. Under date of February 5, 1962, counsel had written to Mr. Hill, a director of defendant and chairman of the Finance Committee of defendant's parent corporation, setting up items for the agenda of the directors' meeting of February 26, 1962. In that letter counsel stated: "At this time there will be approved the promotion of Mr. I. L. Parks with the probable title of Vice President and General Manager. His base pay will be $1450.00 per month with a $50.00 per month bonus to be paid at the end of each year for each half million dollars of gross sales over 4½ million dollars. * * * Walter Duckstad and Ed Woods have gone over this letter with me * * *." No reference was made to any other form of compensation in any conference or letter.

Defendant placed in evidence also a minute of the meeting of defendant's board of directors held on January 15, *1963,* which recited: "There was then discussion of the compensation arrangement of Mr. Parks, General Manager of Midland, and on motion duly made, seconded and unanimously carried, it was agreed that his base compensation was increased to $20,000 per year. In addition, he shall have *the same incentive formula as last year, namely* $120.00 per year additional pay for each $100,000 of gross sales in excess of $4,-500,000." (Our emphasis).

While plaintiff introduced no direct evidence to show that Woods had the actual authority to make the alleged promise, it is established without question that Woods was the president of the defendant at the time asserted. The question then suggests itself: What actual authority can be implied from the fact that an officer—here the president—occupied a named office and possessed a particular title? Or as the question is sometimes put: What power inheres in the very fact that one occupies the presidency?

Out of a welter of decided cases, Fletcher on Corporations (Vol. 2, Sections 559, 592) arrives at the following conclusions:

"In view of the fact that presidents of corporations are often given general supervision and control over their management the liberal and modern rule seems to be that contracts or acts made or done by the president of a corporation in the course of its ordinary business will be presumed to have been within his authority unless the contrary appears, or else it is expressly stated that the president has no such powers.

\* \* \* \* \* \*

\* \* \* Even if the president be deemed to have power to act in behalf of the corporation, or there is a presumption in favor of his authority, the power does not extend to acts outside the ordinary course of business nor to acts merely for his own benefit. In other words, if the terms of a contract entered into on behalf of a corporation by its officers are extraordinary or unusual, such as are not ordinarily made by the president or other officer in the ordinary course of the transaction of the current business of the corporation, the party contracting with the officer is put upon inquiry as to his authority."

In Sparks v. Despatch Transfer Co., 104 Mo. 531, 15 S.W. 417, at 419, 12 L.R.A. 714, the Supreme Court said:

"The president of a business corporation is its chief executive officer. He may, without any special authority from the board of directors, perform all acts of an ordinary nature, which by usage or necessity are incident to his office, and may bind the corporation by con- tracts in matters arising in the usual course of business."

Later, in Fair Mercantile Co. v. Union-May-Stern Co., supra, the Supreme Court reviewed antecedent Missouri cases and repeated verbatim the above quotation from the Sparks case (at p. 753 of 221 S.W.2d). Interestingly, some of the precise language of the Sparks case was used by the New Jersey Court of Errors and Appeals in Mausert v. Christian Feigenspan, 68 N.J. Eq. 671, 679, 63 A. 610, 611.

"[The] powers [of a president] over its business and property [of a corporation] are strictly the powers of an agent, powers delegated to him by the directors, who are the managers of the corporation, and the persons in whom the control of its business and property is vested. He may, without any special authority from the board of directors, \* \* \* bind the corporation by contracts in matters arising in the usual course of business. \* \* \* but beyond this his official position gives him no more control over its property, funds, or business, than any other director." [3]

This proposition was reaffirmed and applied by the same court in Sattler v. Howe Rubber Corporation, 98 N.J.L. 460, 121 A. 523, 524.

Thus if there be inherent authority in a president resulting from the mere fact that he occupies the office, then even under what Fletcher has found to be the "liberal and modern rule" such inherent power is limited to the doing of acts—or the making of contracts, described sometimes as routine, sometimes as ordinary or usual, or—"in the course of its ordinary business" or "of an ordinary nature" or "in the usual course of business". [4]

---

3. "The president of a business corporation has no power as such to constitute a general business manager without the consent of the directors." Vogel v. St. Louis Museum, Opera & Fine-Art Gallery, 8 Mo.App. 587.

4. A less liberal rule states that "the office of president of a private corporation of itself confers no power on the incumbent to bind the corporation or control its property." Wainright v. P. H. & F. M. Roots Co., 176 Ind. 682, 97 N.E. 8.

It could not be maintained with any degree of plausibility that making a contract to install a third person as overall general manager of a corporation's business was a routine transaction in the ordinary course of the corporation's business. Such a contract was not "of an ordinary nature" and the necessity therefor did not arise "in the usual course of business." The same must be said regarding any contract for the sharing of the corporation's profits. The latter is so extraordinary that it must be excluded from any concept of the usual course of business. It must be held that there was no inherent power in Woods to enter into the contract here in question arising from the mere fact that Woods occupied the position of president.

Plaintiff's verdict directing instruction was based in the conjunctive, upon defendant's agreement to pay the $10,000 bonus based upon profits and upon the actual realization of $200,000 in profits for the year 1962. There was evidence from the two sides tending to show that there were and that there were not profits of $200,000 for the year. The verdict for defendant then leaves us uninformed as to the ground upon which the jury denied plaintiff a recovery. Perhaps the jury believed that there was no promise by Woods that the corporation would pay a profit bonus. But if that verdict was founded upon the jury's belief that the president lacked the authority to make the questioned promise on behalf of the corporation there was substantial and uncontradicted evidence upon which to found that belief.

Obviously the plaintiff has failed to sustain the burden of persuasion in at least one of three necessary respects: the president's promise of the $10,000 bonus or the authority of the president to make such a promise on behalf of the corporation or the extent of the corporation's profits for 1962.

Appellant makes further complaint in his Point II that the court erred in allowing defendant's counsel to make repeated objections and statements in the hearing of the jury which were in the form of argument in support of defendant's case. Appellant's brief does not indulge in specifics in support of this assignment and on the whole confines its complaint in general terms to defence counsel's use of the terms "profit bonus, incentive bonus and discretionary bonus" in the course of the trial. Plaintiff's opening statement made the differentiation between a bonus based on gross sales and a bonus based on net profits. Plaintiff's direct testimony referred to a gross sales bonus and then, distinct therefrom, a bonus based on net profits. Further along in his direct testimony plaintiff denominated the $10,000 paid to him as a "profit bonus". Upon cross-examination plaintiff was asked:

"Mr. Parks, I believe you testified that in a meeting with you and Mr. Woods in the early part of 1962, he offered to make you a general manager at a salary of approximately fifteen thousand dollars a year plus an incentive bonus based upon a hundred twenty dollars per year for each one hundred thousand dollars in excess of four and a half million dollars, and in addition thereto, a bonus of ten thousand dollars in the event that the company's net profits before taxes equalled or exceeded two hundred thousand dollars. Is that correct?"

Answer: "That is right."

Q: "Was there any other time Mr. Woods made this offer to you of what we will now denominate the profit bonus?"

A: "Yes, when we talked about 1963, after '62 was over."

After plaintiff had injected the idea of the differentiation between two kinds of bonuses into the case by his opening statement and had repeated that idea by his own direct testimony it was quite the natural thing for the defendant, in the service of brevity, to apply differentiating labels to the two kinds of bonuses. In that portion

of the testimony last quoted, the question put by counsel made it clear to the plaintiff and to the jury the sense in which counsel was using the term "incentive bonus" as well as the meaning of "profit bonus". Thereafter, plaintiff testified:

Q. "You are not claiming that the incentive bonus based upon gross sales * * * was not paid to you, is that correct, you acknowledge that was paid?"

A. "Sure".

Later, questioned about the notification of his 1963 compensation given him by Mr. Woods, plaintiff was asked: "You don't recall his having said anything about your incentive bonus or profit bonus?" Answer: "No."

■ The evidence above recited was received without objection. It is clear that the use of the term "incentive bonus" in this examination of the plaintiff was not misleading and could not have been confusing.

Moreover in defendant's opening statement the jury was well informed as to the bonus nomenclature which defendant was using; counsel was quite explicit in differentiating incentive bonus from profit bonus and invariably linked "incentive bonus" with gross sales. The meaning of "profit bonus" as used by defendant was made equally clear. In this opening statement the jury was fully informed that it was defendant's contention that the $10,000 payment was a "discretionary bonus". Defendant's witness testified that that payment was a discretionary bonus.

In all this we find no basis for plaintiff's charge that defendant's use of the terms—incentive bonus, profit bonus and discretionary bonus—was "obviously calculated to confuse the jury concerning the Plaintiff's right to the bonus as pleaded by interjecting into the case different types of bonus."

■ Appellant's last point relates to the exclusion of testimony on cross-examination of defendant's president. His offer of proof: That the president's minor son sold two bulls to the defendant corporation for approximately twelve hundred dollars and that the bulls proved worthless and that they were sold in the same year at only a fraction of their cost; that the plaintiff objected violently to that deal; that the president used his position to build buildings on an experimental farm owned by him and leased to defendant corporation.

The appellant maintains that the proffered evidence was proof of the bias and prejudice of Woods toward appellant, was therefore related to the question of Woods' credibility and hence was admissible.

■ Appellant attempts first to bring the evidence offered within the surrounding circumstances rule enunciated in Gibbons v. Chomeau & Engelland, Inc., 240 Mo.App. 41, 210 S.W.2d 715. The purchase of the bulls and the improvement of the farm cannot be regarded as surrounding circumstances; the issue here was the content of the agreement entered into by appellant and Woods and the matters offered in evidence had no relation to the events leading up to the agreement reached in early 1962. That evidence was not contemporary with the making of the agreement, nor even closely related in time, furnished no background or color for it and explained no part of it. The rule for which appellant contends is simply the res gestae rule and we know of no basis for asserting that the offered evidence was any part of the res gestae.

The interest of the witness Woods was made amply apparent throughout the trial of the case, both by plaintiff's testimony and by Woods' direct examination. It was an interest of which the jury could not have been unaware. Woods was the only other participant in the conference leading to the agreement which plaintiff alleged and had already contradicted plaintiff's testimony on the only matter in issue. In addition, the relationship of Woods to the per-

sons who controlled both the defendant corporation and the corporation of which Woods is now the president was well demonstrated. All this was quite sufficient to inform the jury of bias on Woods' part. There was nothing that made it useful to cumulate evidence of that bias in order to protect plaintiff's position in the contemplation of the jury. The addition of any other evidence for that purpose would be only an act of supererogation. For that reason and other reasons hereinafter stated, there was no abuse of discretion on the part of the trial court in excluding the evidence offered.

 In Kells v. Pevely Dairy Company, Mo.App., 393 S.W.2d 61, 65, this Court cited as its authority the Supreme Court case of Eickmann v. St. Louis Public Service Company, Mo., 323 S.W.2d 802, where the court stated at page 807: "The law is well settled that the extent and scope of cross-examination in a civil action is discretionary with the trial court and its rulings in regard thereto will not be disturbed unless an abuse of discretion is clearly shown." This Court then proceeded to apply that stated principle to the trial court's action in overruling the cross-examiner's attempt to examine a witness as to collateral matters for the purpose of attacking his credibility and found no abuse of discretion. The rule of discretion as to cross-examination upon collateral matters for purposes of impeachment is found enunciated in many other Supreme Court cases, including Bond v. Wabash Railroad Company, Mo., 363 S.W. 2d 1, 6; State v. Cox, Mo., 352 S.W.2d 665, 673; Willis v. Wabash Railroad Company, Mo., 284 S.W.2d 503, 512; Arnold v. Alton R. Co., 348 Mo. 516, 521, 154 S.W.2d 58, 60. And see Wilcox v. Coons, 362 Mo. 381, 241 S.W.2d 907; Adriance v. Arnot, 31 Mo. 471.

To have admitted the proffered evidence would have resulted, in effect, in the trial of two cases. The introduction of that evidence would have caused the introduction of rebutting or explanatory evidence on the part of defendant. The circumstances of the purchase of the bulls would have been explored in detail; perhaps their procreative capabilities would have been investigated. The terms of the lease of the Woods farm and the type and cost of the buildings erected thereon would have become pertinent. All this would have been a far cry from the issue of the plaintiff's compensation. It would have distracted and diverted the jury and might have been highly entertaining. But it would have focused attention upon an extraneous affair and given inordinate emphasis to a subject extrinsic to the matter of plaintiff's compensation. It was not an abuse of discretion to obviate such a result by the exclusion of the evidence offered.

The judgment should be affirmed.

PER CURIAM:

The foregoing opinion by TOWNSEND, C., is adopted as the opinion of this Court. Accordingly, judgment is affirmed.

ANDERSON, P. J., and RUDDY, J., concur.